UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Righthaven LLC, | Civil Action No. 2:10-CV-3075-RMG-JDA |
| Plaintiff, | |
| v. | **MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION** |
| Dana Eiser, | |
| Defendant. | |

The Defendant Dana Eiser moves to dismiss Righthaven's Amended Complaint for lack of subject matter jurisdiction. The motion is a factual challenge. See Cantley v. Simmons, 179 F.Supp.2d 654, 655 (S.D. W.Va. 2002). Accordingly, "The burden of proving subject matter jurisdiction on a motion to dismiss is on the plaintiff, the party asserting jurisdiction."Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982).

Righthaven claims to own the copyright allegedly infringed by Eiser. Righthaven supposedly obtained this ownership by virtue of an assignment. The basis of this motion is that Righthaven's copyright assignments are invalid, therefore Righthaven is not the true owner of the copyright at issue. As a result, Righthaven lacks standing to assert a claim for copyright infringement.

The issues in this motion are distinct from the issue of copyright infringement, therefore they should be considered at a preliminary stage of the proceedings. Adams at 1219. Accordingly, Defendant Eiser respectfully submits the following combined motion to dismiss and supporting memorandum for consideration by this Honorable Court:

## TABLE OF CONTENTS

Table of Authorities ................................................................................................3

Table of Exhibits ....................................................................................................5

I.      Background ....................................................................................................7

II.     Righthaven's assignments are invalid under the Copyright Act ..................10

III.    Righthaven is not an assignee, it is a law firm in disguise .........................16

        A.    A look at form over substance .........................................................16

        B.    Righthaven's scheme has been tried before .....................................17

        C.    Righthaven's patent analogy in no way rescues its business model ...........27

        D.    How to determine the (in)validity of an assignment ......................29

        E.    State law can invalidate a copyright assignment, and South Carolina law does ........37

        F.    Why? ................................................................................................39

IV.     The burden shifts to Righthaven ................................................................40

        A.    MediaNews Group did not validly assign any rights to Righthaven, much less full ownership ...................................................................40

        B.    MediaNews Group is not the author of the Rosen Letter .................41

V.      Conclusion ..................................................................................................43

# TABLE OF AUTHORITIES

## Enactments

Article III, U.S. Constitution.................................................................................33

17 U.S.C. § 101(2) ...............................................................................................41

17 U.S.C. § 106................................................................................................10, 38

17 U.S.C. § 501(b) ...............................................................................................10

17 U.S.C. § 505 ................................................................................................44-45

Rule 5.4(a), SCRPC ..............................................................................................39

## Federal Cases

Aronson v. Quick Point Pencil Co., 440 U.S. 257 (1979) ............................................37

ABKCA Music, Inc. v. Harrisongs Music, Ltd., 944 F.2d 971 (2d Cir. 1991) ............................10

Adams v. Bain, 697 F.2d 1213 (4th Cir. 1982).......................................................................1

Cantley v. Simmons, 179 F.Supp.2d 654 (S.D. W.Va 2002) .........................................................1

Community for Creative Non-Violence v. Reid, 490 U.S. 730 (1989) .........................................41

Compton v. Atwell, 207 F.2d 139 (D.C. Cir. 1953) ......................................................................29

Darden v. Peters, 488 F.3d 277 (4th Cir. 2007)....................................................... 10-11

Fantastic Fakes, Inc. v. Pickwick Int'l, Inc., 661 F.2d 479 (5th Cir. 1981)...................................37

Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567 (2004) ............................................11

Jones v. Niagara Frontier Transp. Auth., 722 F.2d 20 (2d Cir. 1983) .................................... 32-33

Playboy Enterprises, Inc. v. Dumas, 53 F.3d 549 (2d Cir. 1995) ...................................................42

Rawlings v. Nat'l Molasses Co., 394 F.2d 645 (9th Cir. 1968)...........................................28, 32

Secretary of State of Md. v. Joseph H. Munson Co., 467 U.S. 947 (1984)...................................33

SGS-Thomson Microelectronics, Inc. v. International Rectifier Corp., 1994
        WL 374529 (Fed. Cir. Jul. 14, 1994)....................................................... 27-28, 32

Silvers v. Sony Pictures Entertainment, 402 F.3d 881 (9th Cir. 2005)...............................8, 10, 32

*Sprint Communications Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269 (2008) .................................................................................................29, 32

*Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870 (Fed. Cir. 1991) ..............................................................................28-29, 31-32

## State Cases

*Bay County Bar Ass'n v. Fin. Sys., Inc.*, 76 N.W.2d 23 (Mich. 1956) ................................... 18-19

*Bank of Cave Spring v. Gold Kist, Inc.*, 327 S.E.2d 800 (Ga. Ct. App. 1985) .............................30

*Brown v. Unauthorized Practice of Law Comm.*, 742 S.W.2d 34 (Tex. Lt. App. 1987) ..................................................................................................33

*Burkhardt v. Bailey*, 680 N.W.2d 453 (Mich. Ct. App. 2004) .....................................................30

*Hospital Credit Exchange v. Shapiro*, 59 N.Y.S.2d 812 (N.Y. Mun. Ct. 1946) .....................18, 31

*Iowa Supreme Court Comm'n on Unauthorized Practice of Law v. A-1 Associates Ltd.*, 623 N.W.2d 803 (Iowa 2001) ............................................... 22-23

*Moore v. Weinberg*, 644 S.E.2d 740 (S.C. Ct. App. 2007) ....................................................38, 41

*Nelson v. Smith*, 154 P.2d 634 (Utah 1944) ..........................................................................17. 20

*People v. Adams*, 243 P.3d 256 (Colo. 2010)................................................... 24-26, 29, 31, 35

*Roberts v. LaConey*, 650 S.E.2d 474 (S.C. 2007) ..................................... 8, 23, 29, 31, 38-39, 41

*State ex rel. Frieson v. Isner*, 285 S.E.2d 641 (W.Va. 1981)................................................21, 23

*State ex rel. Norvell v. Credit Bureau of Albuquerque, Inc.*, 514 P.2d 40 (N.M. 1973) ........................................................................... 19-20, 23, 31

*State ex rel. State Bar of Wis. v. Bonded Collections, Inc.*, 154 N.W.2d 250 (Wis. 1967) ..................................................................................................19, 23

## Other Authority

Sir Winston Churchill, Remarks to the House of Commons of the Parliament of the United Kingdom, (June 4, 1940) available at audio.theguardian .tv/sys-audio/Guardian/audio/2007/04/20/Churchill.mp3 ......................................................39

**TABLE OF EXHIBITS**

| *Referred to as:* | *Full Citation* | *Ex.* |
|---|---|---|
| SAA | Righthaven's Strategic Alliance Agreement with Stephens Media, LLC dated 1-18-2010 | A |
| SAA Clarification | Clarification and Amendment to Strategic Alliance Agreement dated 5-9-2011 | B |
| Order Unsealing SAA | Order dated 4-14-2011, Dkt. #93, <u>Righthaven v. Democratic Underground</u>, 2:10-cv-01356-RLH-GWF, 2011 WL 1457743 (D. Nev.) (HUNT, J.) | C |
| <u>Democratic Underground</u> Dismissal | Order dated 6-14-2011, Dkt. #116, <u>Righthaven v. Democratic Underground</u>, 2:10-cv-01356-RLH-GWF, ___ F.Supp.2d ___, 2011 WL 2378186 (D. Nev. June 14, 2011) (HUNT, J.) | D |
| <u>Hoehn</u> Dismissal | Order dated 6-20-2011, Dkt. #28, <u>Righthaven v. Hoehn</u>, 2:11-cv-00050-PMP-RJJ, ___ F.Supp.2d ___, 2011 WL 2441020 (D. Nev.) (PRO, J.) | E |
| <u>DiBiase</u> Dismissal | Order dated 6-22-2011, Dkt. #72, <u>Righthaven v. DiBiase</u>, 2:10-cv-01343-RLH-PAL, 2011 WL 2473531 (D. Nev. June 22, 2011) (HUNT, J.) | F |
| <u>Barham</u> Dismissal | Order dated 6-22-2011, Dkt. #20, <u>Righthaven v. Barham</u>, 2:10-cv-02150-RLH-RJJ, 2011 WL 2473602 (D. Nev. June 22, 2011) (HUNT, J.) | G |
| <u>Jama</u> Summary Judgment | Order dated 4-22-2011, Dkt. #28, <u>Righthaven v. Jama</u>, 2:10-cv-01322-JCM-LRL, 2011 WL 1541613 (D. Nev. April 22, 2011) (MAHAN, J.) | H |
| Order to Show Cause by Judge Mahan | Order dated 4-28-2011, Dkt. #21, <u>Righthaven v. Pahrump Life</u>, 2:10-cv-01575-JCM-PAL (D. Nev.) (MAHAN, J.) | I |
| Order to Show Cause by Judge Hicks | Order dated 6-28-2011, Dkt. #7, <u>Righthaven v. Kirk</u>, 2:11-cv-00722-LRH-PAL (D. Nev.) (HICKS, J.) (also filed in all other Righthaven cases assigned to Judge Hicks) | J |
| District of Colorado Stay Order by Judge Kane | Order dated 5-19-2011, Dkt. #21, <u>Righthaven v. Sumner</u>, 1:11-cv-00222-JLK (D. Colo.) (KANE, J.) (also filed in all other Righthaven cases in the District of Colorado) | K |
| Righthaven Intervention | Righthaven's Application to Intervene as of Right Pursuant to Federal Rule of Civil Procedure 24(A)(2) dated 6-23-2011, Dkt. #120, <u>Righthaven v. Democratic Underground</u>, 2:10-cv-01356-RLH-GWF (D. Nev.) | L |

| Righthaven Response to <u>Amici</u> | Plaintiff Righthaven LLC's Omnibus Response to the Amicus Curiae Briefs of Democratic Underground and Professor Jason Schultz dated 6-22-2011, Dkt. #44, <u>Righthaven v. Pahrump Life</u>, 2:10-cv-01575-JCM-PAL (D. Nev.) | M |
|---|---|---|
| *Arkansas Democrat-Gazette* Story | Toby Manthey, *Firm Holds Websites to the Law*, Arkansas Democrat-Gazette, August 26, 2010 | N |
| *New York Times* Story | Dan Frosch, *Enforcing Copyrights Online, for a Profit*, New York Times, May 2, 2011 | O |
| *Wired.com* Story | David Kravets, *Newspaper Chain's New Business Plan: Copyright Suits*, Wired.com, July 22, 2010 | P |
| Gibson Interview | "Face to Face" Interview with Steve Gibson, June 22, 2011[1] | — |
| Rosen Freelance Column | Mike Rosen, *Social Security's insolvency*, The Denver Post, April 14, 2011 | Q |
| *Denver Westword* Story about Rosen Plagiarism | Michael Roberts, *Mike Rosen plagiarized himself in* Denver Post *column? He says he did nothing wrong*, Denver Westword, February 17, 2011 | R |
| *Rocky Mountain News* Shutdown | Lynn DeBruin & Lisa Ryckman, *Rocky Mountain News to close, publish final edition Friday*, Rocky Mountain News, February 26, 2009 | S |
| Rosen *Rocky Mountain News* Column | Mike Rosen, *Educrats vs. common sense*, Rocky Mountain News, February 20, 2009 | T |
| Rosen *Real Clear Politics* Column | Mike Rosen, *Another Nutty Professor*, Real Clear Politics, November 25, 2005 | U |
| Righthaven Website | Righthaven's Website at <u>www.righthaven.com</u> | V |
| S.C. Supreme Court Original Jurisdiction Petition | <u>Citizens Against Litigation Abuse, Inc. v. Righthaven LLC</u> (S.C. Sup. Ct. filed June 27, 2011) (original jurisdiction action seeking unauthorized practice of law declaratory judgment and injunction) (also involving Lowcountry 9/12 Project as plaintiff) | W |
| Verification and Authentication | Verification and Authentication by J. Todd Kincannon | X |

---

[1] The interview is available online at <u>www.lasvegassun.com/videos/2011/jun/22/5268/</u>

# I. BACKGROUND

Righthaven LLC is not a law firm, yet its exclusive business is prosecuting contingency-fee lawsuits for the benefit of its clients. After finding media clients who have potential copyright infringement claims, Righthaven obtains "assignments" of those claims and agrees to divide litigation proceeds 50/50 with the client. Righthaven then files lawsuits in its own name—275 suits against approximately 500 defendants so far in Nevada, Colorado, and South Carolina.

Each of Righthaven's complaints allege that it holds all right, title, and interest in the copyrights over which it sues. The Amended Complaint in this action is no different. See Dkt. #36 ¶¶ 9, 10, 17, 24-27. Righthaven claims to have obtained these rights by virtue of assignments from its clients—Stephens Media LLC, owner of the *Las Vegas Review-Journal*, or MediaNews Group Inc., owner of *The Denver Post*.[2]

The terms of the assignments are governed by Righthaven's so-called "Strategic Alliance Agreement" ("SAA") it has with its clients. See SAA, Ex. A. The SAA with Stephens Media was unsealed on April 14, 2011. See Order Unsealing SAA, Ex. C at 5. Righthaven's SAA with MediaNews Group has terms that are legally indistinguishable from the Stephens Media SAA.[3]

After the SAA was revealed, its flaws quickly became evident. For one, it was clear that Righthaven's rights were purely illusory and that the assignments transferred only the "bare right to sue." But attempts to assign the bare right to sue over copyright infringement actually assign

---

[2] Of the 275 Righthaven lawsuits, 274 have been over material appearing in either the *Las Vegas Review-Journal* or *The Denver Post*. The exception is Righthaven v. Allec, 2:11-cv-00532-KJD-PAL (D.Nev.) involving an entity called Stevo Design.

[3] Righthaven is set to produce the MediaNews Group SAA on or about July 8, 2011, in a Colorado action, Righthaven v. Wolf, 1:11-cv-830-JLK (D. Colo.). The Defendant in this case has not fought to obtain the SAA because of its imminent production there, so as to save time and resources of the parties and the Court. Even so, the terms of the MediaNews Group SAA are clearly identical in practical effect to the Stephens Media SAA.

nothing, because the Copyright Act doesn't allow it. E.g., Silvers v. Sony Pictures Entertainment, 402 F.3d 881, 890 (9th Cir. 2005) ("the Copyright Act does not permit copyright holders to choose third parties to bring suits on their behalf.") (quotation omitted). A second problem, even more fundamental, is that Righthaven's "assignments" are actually representation agreements, and such an assignment is void. E.g., Roberts v. LaConey, 650 S.E.2d 474 (S.C. 2007).

Righthaven defendants in Nevada and Colorado are now seeking dismissals because the assignments are invalid and Righthaven has no standing to sue. In Nevada, Judge Hunt issued an order to that effect in Righthaven v. Democratic Underground, as did Judge Pro in Righthaven v. Hoehn. Democratic Underground Dismissal, Ex. D at 15; Hoehn Dismissal, Ex. E at 10.

In Democratic Underground, Judge Hunt forcefully rejected Righthaven's citation to prior favorable rulings, writing: "As the undersigned issued one of the orders Righthaven cites [to support its standing arguments], the undersigned is well aware that Righthaven led the district judges of this district to believe that it was the true owner of the copyright in the relevant news articles. Righthaven did not disclose the true nature of the transaction[.]" Democratic Underground Dismissal, Ex. D at 10. Judge Hunt has gone on to dismiss Righthaven's complaints in Righthaven v. Barham and Righthaven v. DiBiase for lack of standing and will undoubtedly dismiss all Righthaven complaints before him in short order. See generally DiBiase Dismissal, Ex. F; Barham Dismissal, Ex. G.

Additionally, Judges Mahan and Hicks in Nevada have issued orders to show cause why Righthaven cases should not be dismissed for lack of standing:

> [T]he defendant has contested Righthaven's ownership of the disputed copyright, noting that the plaintiff has not produced a written document evidencing ownership in the copyright in the Article. . . . [T]he court finds resolution of the issue sufficiently pressing as to warrant immediate consideration.

> Righthaven's ownership of its assigned copyrights has been generally contested in a case before Judge Hunt, <u>Righthaven LLC v. Democratic Underground LLC et al.</u> In <u>Democratic Underground</u>, the newly unsealed "Strategic Alliance Agreement," governing all purported copyright assignments from Stephens Media to Righthaven, appears to support [defendant's] claim that Righthaven does not have standing to sue for copyright infringement. . . .
>
> This court believes that the issue should be addressed at the outset of Righthaven litigation, as it goes to the plaintiff's standing to bring a copyright infringement claim at all. Thus, in the interest of judicial economy, the court issues this order to show cause why the case should not be dismissed for plaintiff's lack of beneficial ownership of the copyright, and, therefore, lack of standing to sue.

Order to Show Cause by Judge Mahan, Ex. I at 1-2 (citations and quotations omitted).

> Standing to sue is an indispensable part of a federal court's Article III jurisdiction and must be addressed by the court even if the parties fail to raise it. The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines.
>
> In the ten above-captioned cases, the pleadings and other papers on file reveal that the standing issues are likely identical to the standing issues determined adversely to Righthaven in <u>Democratic Underground</u> and <u>Hoehn</u>. Because substantial doubt exists as to Righthaven's standing and the court's subject-matter jurisdiction, Righthaven is hereby ordered to show cause why each of the above-captioned cases should not be dismissed for lack of standing. At minimum, Righthaven's written response shall include copies of the SAA, the Clarification, and the assignments of the particular works in question, and shall specifically address whether and how the facts and legal issues relating to Righthaven's alleged standing are identical to the standing issues addressed in <u>Democratic Underground</u> and <u>Hoehn</u>, and if not, in what material respects they differ.

Order to Show Cause by Judge Hicks, Ex. J at 4-5 (citations and quotations omitted).

Additionally, Judge Kane of Colorado—handling all Righthaven cases there—has expressed doubts about Righthaven's standing and stayed all cases in Colorado except <u>Righthaven v. Wolf</u>, 1:11-cv-00830 (D. Colo.), where he will issue a ruling on standing:

> Because Righthaven is the party seeking to invoke federal jurisdiction, it bears the burden, when jurisdiction is challenged, of establishing it is both statutorily and constitutionally proper as a matter of law.
>
> Because there are serious questions as to whether my exercise of subject matter jurisdiction over Righthaven's claim of copyright infringement is proper, I think it

> most prudent to stay the proceedings in all pending cases in this District in which Righthaven is the named Plaintiff. Should I find that I lack subject matter jurisdiction over Righthaven's claim of copyright infringement, it is likely that I will be required to dismiss all pending actions. A stay will best conserve the parties' and the Court's resources pending resolution of this fundamental inquiry.

District of Colorado Stay Order by Judge Kane, Ex. K at 2 (citation omitted).

Seeing the handwriting on the wall, Righthaven attempted to rewrite the SAA by issuing a "clarification." See SAA Clarification, Ex. B. But even the clarified SAA fails to give Righthaven standing, as Judges Pro and Hunt have indicated. See Hoehn Dismissal, Ex. E at 10 (holding that SAA Clarification still fails to provide standing); see also Democratic Underground Dismissal, Ex. D at 8 n.1 (suggesting in dicta that SAA clarification is cosmetic and ineffective).

## II. RIGHTHAVEN'S ASSIGNMENTS ARE INVALID UNDER THE COPYRIGHT ACT

The Copyright Act establishes who has standing to sue over copyright infringement, limiting standing to an "owner of an exclusive right under a copyright[.]" 17 U.S.C. § 501(b). The Copyright Act is clear: if an infringement plaintiff is not the owner of an exclusive right under a copyright, the plaintiff lacks standing. The "exclusive rights" are listed in 17 U.S.C. § 106. Notably, the right to sue over infringement is not listed.

An assignment of only the right to sue therefore conveys nothing, because a party having *only* the right to sue lacks any of the exclusive rights in Section 106. Without any exclusive rights, a party has no standing under Section 501(b). E.g., Silvers, supra; ABKCA Music, Inc. v. Harrisongs Music, Ltd., 944 F.2d 971, 980 (2d Cir. 1991) ("the Copyright Act does not permit copyright holders to choose third parties to bring suits on their behalf.").

The counterargument is that there is a general common law right to assign causes of action; therefore, the right to sue over copyright infringement should be assignable by itself. This argument is entirely foreclosed in the Fourth Circuit by Darden v. Peters, 488 F.3d 277, 284 (4th

Cir. 2007) ("Copyright is solely a creature of statute; whatever rights and remedies exist do so only because Congress provided them."). Therefore, if Righthaven was not the owner of an exclusive right when it filed this case on December 2, 2010,[4] it does not have standing.

Righthaven's Complaint (Dkt. #1) and Amended Complaint (Dkt. #36) both allege that "Righthaven is the owner of the copyright" in this action. Dkt. #1 at ¶ 9; Dkt. #36 at ¶ 9. The Amended Complaint adds an allegation that "Righthaven obtained ownership of the copyright . . . through a valid and enforceable assignment from the original owner[.] The Assignment granted Righthaven full ownership in and to the copyright to the Work[.]" Dkt. #36 ¶ 10. Further, the copyright application attached as Exhibit 3 to both the Complaint and Amended Complaint identifies the assignor as the author of the work (a work for hire) as "Media News Group, Inc." Dkt. #1-1 at 19; Dkt. #36-1 at 19.

Righthaven's assignments do purport to convey all right, title, and interest (though with a right of reversion, which is fatal, as described infra). SAA, Ex. A at 16. But each assignment is controlled by Righthaven's SAA, which operates to take back the rights the assignment purports to grant. See Democratic Underground Dismissal, Ex. D at 6. ("Righthaven argues that the SAA's provisions . . . do not alter the unambiguous language of the Assignment or limit the rights it obtained . . . in the Assignment. This conclusion is flagrantly false—to the point that the claim is disingenuous, if not outright deceitful.").

Judge Hunt in Democratic Underground and Judge Pro in Hoehn both found part of Section 7.2 of the SAA to be extremely problematic:

> Despite any such Copyright Assignment, Stephens Media shall retain (and is hereby granted by Righthaven) an exclusive license to Exploit the Stephens Media Assigned Copyrights for any lawful purpose whatsoever and Righthaven

---

[4] Jurisdiction depends upon the state of things at the time of filing. Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 570 (2004).

> shall have no right or license to Exploit or participate in the receipt of royalties from the Exploitation of the Stephens Media Assigned Copyrights other than the right to proceeds in association with a Recovery. To the extent that Righthaven's maintenance of rights to pursue infringers of the Stephens Media Assigned Copyrights in any manner would be deemed to diminish Stephens Media's right to Exploit the Stephens Media Assigned Copyrights, Righthaven hereby grants an exclusive license to Stephens Media to the greatest extent permitted by law so that Stephens Media shall have unfettered and exclusive ability to Exploit the Stephens Media Assigned Copyrights.

SAA § 7.2, Ex. A at 4. Judge Hunt concluded: "The plain and simple effect of [Section 7.2] was to prevent Righthaven from obtaining, having, or otherwise exercising any right other than the mere right to sue as Stephens Media *retained* all other rights." Democratic Underground Dismissal, Ex. D at 5; see also Hoehn Dismissal, Ex. E at 8.

Also problematic, the assignment is subject to termination at any time:

> ***Stephens Media's Right of Reversion.*** Stephens Media shall have the right at any time to terminate, in good faith, any Copyright Assignment (the "Assignment Termination") and enjoy a right of complete reversion to the ownership of any copyright that is the subject of a Copyright Assignment; provided, however, that if Righthaven shall have commenced an action to prosecute an infringer of the Stephens Media Assigned Copyrights, Stephens Media shall be exclusively responsible for effecting termination of such action including, without limitation, all Losses associated with any dismissal with prejudice.

SAA § 8, Ex. A at 4. And Section 3.3 of the SAA provides the right to prohibit Righthaven from suing. Id. at 2. Though the right is couched in limiting language, in truth there is no limit. To stop a lawsuit, the assignor need only claim the action is "adverse.". Id. And if for some bizarre reason the Section 3.3 right proved insufficient, the assignor could always exercise its rights under Section 8, revert the copyright, and kill any litigation. Id. at 4.

But the conclusion that Righthaven really doesn't even have the right to sue need not be drawn based only on the four corners of the SAA—it's confirmed by statements from the clients themselves. Righthaven has three media clients: Stephens Media (the *Las Vegas Review-Journal* and others), MediaNews Group (*The Denver Post* and others), and WEHCO Media, Inc. (the

*Arkansas Democrat-Gazette* and others).[5] Officers of each of these clients have publicly stated that the media entities, not Righthaven, have the right to dictate who can and cannot be sued.

Stephens Media's general counsel has said, "I can tell Righthaven not to sue somebody." See *Arkansas Democrat-Gazette* Story, Ex. N at 3. WEHCO Media's president has said that if Righthaven discovers someone has violated WEHCO's copyright, "it would be [WEHCO's] decision whether or not to move forward with it[.]" Id. MediaNews Group's vice president has indicated the same, stating they "reviewed every violation and only approved actions against sites that carried advertising and were not charities." See *New York Times* Story, Ex. O at 3.

But even keeping to the four corners of the SAA, Judge Hunt found the extreme limitations and reversionary language "destroy[ed] Righthaven's supposed rights in the work." Democratic Underground Dismissal, Ex. D at 5. Likewise Judge Pro: "These carveouts deprive Righthaven of any of the rights normally associated with ownership of an exclusive right necessary to bring suit for copyright infringement and leave Righthaven no rights except to pursue infringement actions, a right which itself is subject to Stephens Media's veto." Hoehn Dismissal, Ex. E at 8. Defendant Eiser submits Judges Hunt and Pro are absolutely right, and that Righthaven's Amended Complaint in this case must be dismissed for the same reason.

Righthaven has not yet produced the MediaNews Group SAA but, as described in footnote 3, supra, the MediaNews Group SAA will shortly be produced in another case and will no doubt be unsealed shortly thereafter. However, given the nature of this motion, the burden is on Righthaven to prove that the MediaNews Group SAA is valid and gives Righthaven standing.

Righthaven has not stood idly by while its cottage industry of copyright lawsuits goes by the wayside. Righthaven has already issued one "clarification" of the Stephens Media SAA and

---

[5] Righthaven has never filed a case for WEHCO Media, Inc., for reasons unknown to Defendant.

promises more are on the way if that one doesn't work. Righthaven's clear intent is to rewrite its

assignments over and over until it finds the magic words that give it standing under the

Copyright Act. In fact, Righthaven's CEO Steve Gibson stated during a television interview that

the entire purpose of the federal judiciary's investigation of the standing issue is to give guidance

to Righthaven (and its competitors) on what their "documentation" should be in these cases.[6]

> But Righthaven's new "documentation" hasn't gotten them far:

> Even assuming that the May 9, 2011 Clarification can change the jurisdictional facts as they existed at the time of filing of the suit, it still does not correct the deficiencies with respect to lack of standing. The May 9, 2011 Clarification offers recitals stating the parties' intent "to convey all ownership rights in and to any identified Work to Righthaven . . . so that Righthaven would be the rightful owner of any identified Work and entitled to seek copyright registration." However, it does not provide Righthaven with any exclusive rights necessary to bring suit.

> The May 9, 2011 Clarification provides Righthaven with only an illusory right to exploit or profit from the Work, requiring 30 days advance notice to Stephens Media before being able to exploit the Work for any purpose other than bringing an infringement action. Stephens Media has, in its sole discretion, the option to repurchase the Copyright Assignment for a nominal amount within 14 days, thereby retaining the ability to prevent Righthaven from ever exploiting or reproducing the Work. Stephens Media's power to prevent Righthaven from exploiting the Work for any purpose other than pursuing infringement actions is further bolstered by the Clarification's provision that every exploitation of the Work by Righthaven other than pursuing an infringement action without first giving Stephens Media notice constitutes irreparable harm to Stephens Media. Stephens Media may obtain injunctive relief against Righthaven to prevent such "irreparable harm" and, pursuant to the Clarification, Righthaven has no right to oppose Stephens Media's request for injunctive relief. Accordingly, Righthaven does not have any exclusive rights in the Work and thus does not have standing to bring an infringement action.

Hoehn Dismissal, Ex. E at 10; see also SAA Clarification, Ex. B.

---

[6] Gibson: "The hardworking federal judges are saying: 'This type of documentation needs to be enhanced.'" See Gibson Interview at 5:43, available at www.lasvegassun.com/videos/2011/jun/22/5268/. "I think what the judges are saying is 'listen, folks, Righthaven is filing a lot of lawsuits.' They understand that we're potentially genuine with respect to upholding copyrights. They don't want to see Righthaven competitors potentially come on with not solid documentation, and they're giving us guidance as to what the documentation should be." Id. at 8:13.

Further, while dismissing Righthaven's complaint solely because the original SAA didn't convey standing, Judge Hunt stated his belief in dicta that the clarification was merely cosmetic. Democratic Underground Dismissal, Ex. D at 8 n.1. In response, Righthaven has now petitioned for intervention in the same case on the strength of that clarification. Righthaven Intervention, Ex. L. And if Judge Hunt's opinion doesn't change, even that won't be the end of it:

> As set forth in its previous memorandum, Righthaven believes that the original Assignment and SAA between Righthaven and Stephens Media were sufficient to give Righthaven standing to sue. But since this Court issued its Order to Show Cause, another court in this District has held that these agreements failed to effect a copyright assignment to Righthaven. While Righthaven respectfully disagrees with Judge Hunt's decision, it will not burden this Court with those arguments and will instead address its arguments to the Amendment. Another court in this District has also recently held that Righthaven lacks standing, even under the Amendment. Righthaven disagrees with that decision and intends to appeal. Nonetheless, Righthaven and Stephens Media are considering further amending their agreements in order to prevent other courts from erroneously concluding that Righthaven lacks standing. If and when the parties do so, they will promptly provide the Court with all amended agreements.

Righthaven Response to Amici, Ex. M at 5 n.1.

Righthaven's persistence wouldn't be quite so problematic if its defendants didn't have to foot half the legal bill for its exploration into the validity of copyright assignments.[7] Righthaven

---

[7] Righthaven's take-no-prisoners approach to litigation forced Defendant Eiser, for example, to file a 1003 paragraph, 119 page Second Amended Answer and Counterclaims (Dkt. #53), raising in good faith every possible defense and compulsory counterclaim potentially available. By comparison, Eiser's first Amended Answer and Counterclaims (Dkt. #22) was only 14 pages and 81 paragraphs long. Despite being perfectly acceptable, Righthaven filed a "Motion to Dismiss, or Alternatively Strike" (Dkt. #23) with a 19 page memorandum. Righthaven even went so far as to argue that Defendant's unfair trade practices counterclaim should be dismissed because Defendant cannot show that Righthaven's conduct affects the public interest. Righthaven made this argument despite having sued approximately 500 defendants from all over the country in nearly 300 lawsuits in Nevada, Colorado, and South Carolina. Considering its litigation conduct in other venues as well, it is clear Righthaven is a plaintiff that will do or say just about anything to win, no matter how ridiculous or disingenuous it might be. That sort of litigant poses special challenges for opposing counsel, who have no interest in bothering the Court with pleadings and arguments that might be absurdly comprehensive in any other case. But with Righthaven, undersigned counsel simply have no alternative.

needs to face a hard truth. Its clients can't assign the bare right to sue; the Copyright Act won't let them. But they are clearly unwilling to legitimately assign Righthaven any actual exclusive rights, and any attempt to do so now is an obvious sham. And Righthaven has a much more fundamental problem, one that cannot be cured no matter how many mulligans Righthaven takes.

### III. RIGHTHAVEN IS NOT AN ASSIGNEE, IT IS A LAW FIRM IN DISGUISE

#### A.  A look at form over substance.

Defendant invites the Court to ignore the Righthaven for a moment and consider a general proposition: Assume a company has an actionable claim. The company wants to hire someone to pursue a lawsuit over the claim and finds a firm that employs lawyers and handles lawsuits to do just that. In fact, prosecuting lawsuits is all the firm does. The company and the firm strike a deal: the firm prosecutes the claim, and they split any net recovery 50/50.

In the real world, that arrangement is called a "contingency fee representation agreement," the "company" is the client, and the "firm" is a law firm. But Righthaven does not appear to operate in the real world. Righthaven claims this exact arrangement is actually an "assignment," that it is not a law firm but a "copyright enforcer," and that its clients are not clients but are "key relationships." See Righthaven Website, Ex. V. This is nothing but corporate doublespeak, deployed in an attempt to camouflage an arrangement that is totally impermissible outside the context of a lawyer-client relationship.

Moreover, Righthaven claims to be engaged in a novel pursuit presenting new and undecided issues in copyright enforcement. Those claims are accurate only so long as one does not consider precedents relating to the validity of assignments and the unauthorized practice of law. What Righthaven presents as an inventive new way of enforcing copyrights is nothing more than a copyright-specific form of a scheme that has been rejected, so far as Defendant can

determine, by every court that has ever examined it. When considering the following arguments
and authorities, Defendant submits that it will be extremely useful to keep in mind this language
from the SAA: "Assignor hereby engages Righthaven to undertake the pursuit of Infringement
Actions." SAA § 3.4, Ex. A at 3 (edited for readability).

### B.  Righthaven's scheme has been tried before.

Righthaven is by no means the first entity to obtain an assignment in the nature of a
representation agreement. American courts have consistently refused to allow such a scheme and
have found assignments of this nature to be plainly illegal. An early leading opinion is <u>Nelson v.</u>
<u>Smith</u>, 154 P.2d 634 (Utah 1944), where the Utah Supreme Court found such assignments to be
shams designed to enable the unauthorized practice of law:

> When the defendants solicit the placement of claims with them for collection,
> they are asking third parties to allow them to render the service of collecting the
> claim. At that time the collection agency has absolutely no interest, either legal or
> beneficial, in the claim. The only interest they ever get comes by virtue of a
> promise to prosecute the claim. Courts cannot remain blind to the fact that the
> assignment of the claim to the defendants for collection is not made as a gratuity.
> The percentage of the amount collected which is allowed to the defendants is
> given to them for one purpose only; to compensate them for services rendered in
> the collection thereof. Where the collection practice involves the preparing of
> legal papers, furnishing legal advice and other legal services, the compensation
> allowed must be assumed to be in part allowed to pay for the legal services so
> rendered. No matter how one looks at it, this constitutes the rendering of legal
> services for others as a regular part of a business carried on for financial gain.
> This essential fact cannot be hidden by the subterfuge of an assignment. The
> assignment itself, if used to permit this practice, is for an illegal purpose. . . . The
> taking of an assignment under circumstances such as those detailed above cannot
> possibly change the essential fact that the defendants are rendering legal services
> for another for gain.

<u>Id.</u> at 639-640. This is *exactly* what Righthaven is doing. Righthaven's assignments are
absolutely for the purpose of permitting it, a non-law firm, to practice law and to earn a fee for
the provision of legal services. As the Utah Supreme Court said nearly seventy years ago, this

essential fact cannot be hidden by the subterfuge of an assignment. Such an "assignment" is not an assignment; it is a contingency fee representation agreement.

The representation-agreement-in-disguise scheme did not end in Utah. Two years later, the City of New York had a run-in with a would-be Righthaven, dressed up as a charitable organization. The Hospital Credit Exchange solicited causes of action from charitable hospitals. Hospital Credit Exchange v. Shapiro, 59 N.Y.S.2d 812, 813-14 (N.Y. Mun. Ct. 1946). The Credit Exchange took "assignments of these claims for the sole and express purpose of instituting suit thereon in its own name although in behalf of such hospitals." Id. at 814. The Credit Exchange used its own lawyers to handle the claims. Id. The Credit Exchange then divided its recoveries between itself and the assignor. Id.

The New York court found the Credit Exchange "engaged in the practice of law contrary to public policy and in violation of the Penal Law." Id. at 814. The court refused to allow the sham, stating: "Not so easily is the law circumvented which prevents collection agencies from carrying on a legal practice." Id. at 816. Foreshadowing Righthaven, the court went on:

> This might be very good business for the officials of a closely managed collection agency, who could thus grant themselves very satisfactory compensation for conducting what is tantamount to a law practice. It is not necessary that such compensation take the form of dividends or a distribution of profits; it may be paid in salaries or commissions.

Id. at 816-17.

A decade after New York's rejection of the representation-agreement-in-disguise scheme, the Michigan Supreme Court found itself faced with yet another proto-Righthaven in Bay County Bar Ass'n v. Fin. Sys., Inc., 76 N.W.2d 23 (Mich. 1956). The court found the scheme to be unauthorized practice and could not "escape the conclusion" that the assignments were

invalid. Id. at 29. Just as in New York, it did not matter that the assignee used licensed attorneys to file the suits. Id. The assignee itself had to be authorized to practice law. Id.

"When this is done by one not licensed as an attorney it constitutes the unauthorized practice of law whether done by him in person or through his agent, regardless of whether the latter be a laymen or a licensed attorney." Id. "The corporate defendant has engaged in the unlawful practice [of law]." Id. Righthaven's use of lawyers is no insulation to these arguments.

A decade later Wisconsin encountered the representation-agreement-in-disguise scheme:

> It is sheer hypocrisy to conclude that the percentage retained by the collection agency represents its equity or ownership share of the claim. It is its fee or charge for professional services rendered. Under these circumstances the property right of the creditor is directly affected and his recovery is dependent upon the litigation undertaken. There is no doubt that the client whose interests must be served and represented in the suit for collection under a normal and lawful lawyer-client relationship is the creditor.

State ex rel. State Bar of Wis. v. Bonded Collections, Inc., 154 N.W.2d 250, 256 (Wis. 1967).

The court went on to say that an entity "going into court representing itself as the client perpetrates a fraud on the court" and is practicing law even though it hired a lawyer:

> The fact that the defendants in some instances employ a regularly licensed attorney to prepare necessary legal papers and conduct the trial of a suit does not make their conduct legal. One cannot do through an employee or an agent that which he cannot do by himself. If the attorney is in fact the agent or employee of the lay agency, his acts are the acts of his principal or master. When an attorney represents an individual or corporation, he acts as a servant or agent. Since he acts for others in a representative capacity, doing those things which are customarily done by an attorney, he practices law[.]

Id. Again, Righthaven's use of lawyers to prosecute its claims is no defense to these arguments.

Just four years later, the Credit Bureau of Albuquerque tried the Righthaven path to prosperity. In State ex rel. Norvell v. Credit Bureau of Albuquerque, Inc., 514 P.2d 40 (N.M. 1973), the Credit Bureau took claims on a contingency and "require[d] the creditor to assign his claim to the Credit Bureau when requested . . . for the purpose of allowing the Credit Bureau to

file suit in its own name." Id. The Credit Bureau did not pay for the assignment, it just assumed

the claim in its own name with the contingency fee agreement still in place. Id. The Credit

Bureau then filed suit, giving the creditor-assignor a percentage of any recovery.  Id. at 44.

After apparently employing these tactics for some time, the Credit Bureau finally crossed

the wrong person. The lawyer for one David Norvell realized the scheme was not debt collection

but the unauthorized practice of law. After this revelation, it appears victims of the Credit Bureau

came out of the woodwork and tried to intervene, and so did the attorney general. Id. at 42.

The New Mexico Supreme Court held that the Credit Bureau was engaged in

unauthorized practice: "[C]ollection agencies as a part of their business of serving others, clearly

should not be permitted to prepare legal papers, commence suits, appear in court, prepare

judgments and generally manage law suits for its various customers." Id. at 45. "It does not

matter what particular form or name they give their procedure the practice of furnishing or

performing legal services for another is essentially the same." Id.

The Norvell court then quoted extensively from Nelson v. Smith before stating:

> Such a business conducted for the purpose of bringing legal actions on claims
> owned by third parties and consisting of the payment of all costs and the
> furnishing of all legal services incident to the bringing of the actions is the
> practice of law. Where, as here, the agency rendering the service is a lay agency,
> it is the illegal practice of law. Such is the almost uniform holding of the
> authorities as applied to collection agencies operating along similar lines.
>
> * * *
>
> And so with the right of a plaintiff to try his own lawsuit in any court. If it is
> really his own litigation the right is unquestioned and unquestionable. But if it is
> another's lawsuit or action, placed in plaintiff's name so as to enable him to
> render service to that other under the pretext of trying his own case, it does not
> come under the protection of the rule. And if it is done by one who engages in it
> as a business and holds himself out as peculiarly qualified or equipped, it comes
> under the ban of illegal practice of law.

Id. at 47 (citations and quotations omitted).

Righthaven holds itself out as "The Nation's Pre-Eminent Copyright Enforcer" on its website. See Righthaven Website, Ex. V. This would seem to satisfy the "peculiarly qualified or equipped" requirements. And just as in the Righthaven cases, "The assignments procured by the Credit Bureau were not in truth taken for the purpose of acquiring title and ownership, but rather to facilitate the furnishing of legal services for a consideration." Id. at 49. The unending theme of these cases is that an entity pursuing the Righthaven representation-agreement-in-disguise scheme is entering into sham documents and committing a fraud on the court.

Further, the courts are not as interested in the language of the assignments as in the intent of the parties. But here, the intent of Righthaven and its clients is made clear both by their conduct and by the language of the assignment: "[Assignor] hereby engages Righthaven . . . to undertake . . . the pursuit of Infringement Actions." See SAA § 3.4, Ex. A at 3. This language, simply and plainly, evidences a fundamental intent to retain a representative—an agent—not to divest interest in a claim.

It would appear based on studying the precedents that every few years, in some state or another, someone cooks up the representation-agreement-in-disguise scheme anew, and it never meets with success. In State ex rel. Frieson v. Isner, 285 S.E.2d 641 (W.Va. 1981), yet another group gave the Righthaven scheme a try. The West Virginia Supreme Court was not pleased:

> The operation of a collection agency, in and of itself, does not constitute the unauthorized practice of law. . . . Where, however, a person, association or corporation which collects debts as a regular business attempts to enforce the claims of others by resort to legal proceedings, the debt collector is extending his or its business to include legal representation of creditors. The collection agency is holding itself out not only as an entity which will collect amounts owed to creditors but also as an agent which will render legal services in order to recover debts. It sells its services as a representative in legal actions as part and parcel of its debt collection business. Such activity can be viewed in no other light than as the unauthorized practice of law.

*   *   *

> The Associated Collection Agencies of West Virginia suggest in their Defendant Eiser <u>curiae</u> brief, however, that South Charleston Adjustment Bureau was not rendering legal services to the petitioner's creditors as a part of its debt collection business, but rather had obtained an assignment of the claims from the creditors and was asserting its own claim. . . . The association argues that because the collection agency is asserting its own claim as assignee rather than acting as a representative of the creditor-assignor, it does not violate the prohibition against laymen engaging in the unauthorized practice of law.
>
> Generally an unsettled account or debt due is a chose in action which is assignable, and by virtue of statute the assignee may sue in his own name to recover the debt. . . . Where, however, a collection agency takes an assignment of a creditor's claim solely for the purpose of enabling the agency to maintain suit thereon, numerous jurisdictions have held that the fact that the collection agency, as assignee, is the real party in interest by virtue of the assignment and entitled to maintain suit in its own name is not determinative of the question of whether in so doing the collection agency is engaging in the practice of law.

<u>Id.</u> at 650-51. Delivering the final nail in the coffin of the Righthaven scheme in West Virginia, the Supreme Court held: "In such instances the assignment has been held to be a sham or fraud perpetrated upon the court to allow the collection agency to avoid the prohibition on the unauthorized practice of law." <u>Id.</u> at 651.

The Iowa Supreme Court had a run in with the Righthaven scheme just ten years ago. In <u>Iowa Supreme Court Comm'n on Unauthorized Practice of Law v. A-1 Associates Ltd.</u>, 623 N.W.2d 803 (Iowa 2001), the court found that an entity (other than a law firm) "engages in the unauthorized practice of law when, as a regular part of its business, it procures or takes assignments for collection where the creditor still retains an interest in the underlying debt and the collection agency institutes and maintains legal action to recover the unpaid debt." <u>Id.</u> at 805.

The court rejected the idea that such a relationship was an assignment. <u>Id.</u> at 807. "[W]e are convinced that A-1's practices are not consistent with the ordinary meaning of assignment recognized at common law and by statute." <u>Id.</u> The court went on:

> The assignment form executed by A-1's clients purports to transfer absolutely all right, title, and interest in described accounts receivable owned by A-1's clients.

> If such instrument actually meant what it said, it would come within the ordinary meaning of assignment—a transfer of the assignor's entire interest or rights in the property. And it would plainly give A-1 the right to maintain an action on the debt in its own name and represent itself in court on a pro se basis if it chose to do so.

Id. at 808 (citations omitted).

But the Iowa Supreme Court rejected the assignment as a sham. "A-1's claimed status as a bona fide assignee is defeated under this record, however, because the assignment—though absolute in form—is, in fact, a transfer intended primarily to secure payment for services rendered." Id. Righthaven does not dispute that its right of recovery from its cases is primarily intended to secure payment for services rendered, i.e. "copyright enforcement." Righthaven's clients do not enter into assignments. They enter into representation agreements.

Just four years ago, the South Carolina Supreme Court encountered the representation-agreement-in-disguise scheme. In Roberts v. LaConey, 650 S.E.2d 474 (S.C. 2007), a debt collector approached a creditor to sign an assignment of a judgment to him. Id. at 476. He would attempt to collect the debt for a fee of one-third of the recovery. Id. The debt collector used various legal mechanisms to try to compel payment, including asserting that the claim was now his to pursue pro se and accordingly appearing in court. See generally id.

The South Carolina Supreme Court held the assignment to be a contingency fee representation agreement for legal services with an individual who was not a lawyer. Id. at 478-79. The Roberts court approvingly cited many of the precedents above, describing the scheme as a "sheer hypocrisy," a "fraud on the court," and a "sham perpetrated on the court to enable unauthorized practice of law." Id. (citing Bonded Collections, supra; Frieson, supra). Finally, the court indicated that in such a situation, the assignee had no genuine title, equity, or ownership in the claim. Id. at 478 (citing Bonded Collections, supra; Norvell, supra).

In November of 2010—at the height of the Righthaven enterprise—the Colorado Supreme Court handed down an opinion completely foreclosing Righthaven's operation. In People v. Adams, 243 P.3d 256 (Colo. 2010), the court invalidated an assignment and found unauthorized practice of law by the assignee on facts practically identical to Righthaven's cases.

For an assignee to litigate in Colorado, or anywhere else, the assignor must permanently and totally extinguish all of its rights in favor of the assignee. "[A]n assignment must be complete and effective in order for the assignee to be become the real party in interest with the right to maintain an action in his own name." Id. at 261.  "The assignment of any common law or statutory claim must be clear and final[.]" Id. at 263. "[T]he intent to make an assignment must be clearly reflected in the plain language of the parties' agreements." Id.

Righthaven's assignments are in no way "clear and final." The original assignment has been held invalid by two federal judges in Nevada: Judge Hunt in Righthaven v. Democratic Underground and Judge Pro in Righthaven v. Hoehn. See Democratic Underground Dismissal, Ex. D at 15; Hoehn Dismissal, Ex. E at 10. The "clarified" assignment was also held invalid by Judge Pro, while Judge Hunt clearly indicated his belief that the new assignment was still invalid because the "amendments" were merely cosmetic. See Hoehn Dismissal, Ex. E at 10; Democratic Underground Dismissal, Ex. D at 8 n.1. Judges Mahan and Hicks in Nevada and Judge Kane in Colorado have all expressed concerns about the assignments as well. A "clear and final" assignment would not have met with this sort of reaction from the judiciary.

While the judicial skepticism has so far been based on the Copyright Act's prohibition on right-to-sue assignments, the analysis under basic assignment law is even more revealing. As discussed above, the Righthaven assignments vest exclusive rights of reversion in the assignor. The SAA states: "[Assignor] shall have the right at any time to terminate, in good faith, any

Copyright Assignment[.]" SAA § 8, Ex. A at 4. Ditto the clarified SAA: "[Assignor] has, in its sole discretion, the option to repurchase the Copyright Assignment for a nominal amount within 14 days[.]" <u>See</u> <u>Hoehn</u> Dismissal, Ex. E at 10; <u>see also</u> SAA Clarification § 8.1, Ex. B at 2.

There is no "clear and final" assignment here, and the reason is obvious: Righthaven exists for the *sole* purpose of suing people for the copyright claims of others. Righthaven has no interest in obtaining assignments of copyrights otherwise. Righthaven's media clients fully intend to maintain their copyrights for all purposes other than litigation, which necessitates reversionary language in the assignments. That fact alone invalidates the assignments.

Yet Righthaven claims the courts should not look to the intention of the parties, only to their self-serving documents. But "[a]n assignment which appears to be absolute on its face may not be completely effective if parol evidence demonstrates an intent departing from the terms of the assignment." <u>Adams</u> at 263. Reams of evidence prove that Righthaven's clients don't intend to give clear-and-final assignments but to simply "loan" their copyrights to Righthaven for lawsuits, then retrieve them afterwards. Assignment law absolutely forbids this.

Even if Righthaven and its media clients entered into a permanent assignment of all right, title, and interest, a court could still police the intent of the parties and invalidate the assignment if the documents are merely self-serving shams, which, if Righthaven is involved, they *always* will be. Righthaven could show up at the courthouse with "clarified" assignments from here to eternity, but they will never hide the true intent behind Righthaven. The intent is only to loan a sufficient quantum of rights to Righthaven to sneak the assignment by the federal judiciary's standing inquiry, just long enough to extract a settlement from the defendant.

Righthaven's assignment also fails under <u>Adams</u> because it is a mere cover for a representation relationship. Colorado, like every other jurisdiction, bans this:

> In this case we determine that the assignments were not final and effective. However, we do not base our conclusion that Adams engaged in the unauthorized practice of law solely upon the ineffective assignments. Instead, we rely on the facts in the record of this case in reaching our conclusion that Adams appeared for the subcontractors in a representative capacity in bankruptcy court. The assignments Adams based his bankruptcy court filings upon were not complete, final and valid assignments. The subcontractors/assignors retained a significant interest in their claims. The assignments at issue were not effective because they did not wholly divest the purported assignors of any interest in their claims as demonstrated by admissible parol evidence. Testimony before the [special master] coupled with the terms of the assignment contracts demonstrated that these assignments were not binding, because Adams' subcontractor clients maintained the right to reassignment of their claims. According to their testimony, the clients were expected to assist and cooperate in the pursuit of the claims in court, and they had significant influence upon and control over their claims.

Adams at 264 (citations omitted).

The Adams court found the assignments were representation agreements because the assignors maintained authority over their "assigned" claims. This is exactly the situation with Righthaven. Consider the previously-cited statements of Righthaven's clients about their control of the litigation: Stephens Media's general counsel: "I can tell Righthaven not to sue somebody." *Arkansas Democrat-Gazette* Story, Ex. N at 3. WEHCO Media's president: "[If Righthaven discovers someone has violated WEHCO's copyright], it would be [WEHCO's] decision whether or not to move forward with it[.]" Id. MediaNews Group's vice president: "[MediaNews Group] reviewed every violation and only approved actions against sites that carried advertising and were not charities." *New York Times* Story, Ex. O at 3.

The Adams court invalidated assignments because "[t]he record supports a conclusion that the assignments the subcontractors executed at various times created a client-collector relationship which included the ability of the purported assignor/subcontractors to control the litigation by demanding reassignment of their claims." Adams at 265. Righthaven is *identical*:

> Stephens Media shall have the right at any time to terminate, in good faith, any Copyright Assignment . . . and enjoy a right of complete reversion to the

> ownership of any copyright that is the subject of a Copyright Assignment; provided, however, that if Righthaven shall have commenced an action to prosecute an infringer of the Stephens Media Assigned Copyrights, Stephens Media shall be exclusively responsible for effective termination of such action[.]

SAA § 8, Ex. A at 4.

This language doesn't just fail to give Righthaven standing under the principles of copyright law, it renders the entire assignment invalid under basic assignment law. Righthaven is not a bona fide assignee, it is a representative of the assignors in the claims that it brings. "[Assignor] hereby engages Righthaven . . . to undertake . . . the pursuit of Infringement Actions." See SAA § 3.4, Ex. A at 3. An assignment cannot bear any hallmarks of a representation agreement, nor can the conduct of the parties betray such a relationship even if the assignment does not. For an assignment to be valid, it has to be a complete "hand-off," both in word and in deed. The assignor cannot lurk in the shadows making litigation decisions (or any other decisions). To do so gives rise to a representative relationship wholly inconsistent with a legal assignment.

### C. Righthaven's patent analogy in no way rescues its business model.

The previously cited cases are factually identical to the Righthaven situation. Further analysis is almost redundant. Each of the businesses and individuals mentioned above operated *identically* to Righthaven. Every single one of the foregoing courts would find Righthaven's assignments to be invalid because they are actually representation agreements.

But Righthaven claims there is something different about copyright law that allows it to operate the way it does. If anything, copyright law is more resistant to these claims. Righthaven argues that the purpose of a transaction is irrelevant, that the courts should just accept Righthaven's claim to title—again, backed up by self-serving documents—and move on. For this proposition, Righthaven's filings have cited patent cases: <u>SGS-Thomson Microelectronics, Inc.</u>

v. International Rectifier Corp., 1994 WL 374529 (Fed. Cir. Jul. 14, 1994), and Vaupel
Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870 (Fed. Cir. 1991).

The first point is very simple. Consider the names of the parties: SGS-Thomson
Microelectronics, International Rectifier Corporation, Vaupel Textilmaschinen KG, Meccanica
Euro Italia SPA. The first two are bona fide electronics companies and the last two are bona fide
textile companies. These companies are in the business of business, not the business of litigation.

Examining each case demonstrates facts and circumstances far removed from
Righthaven. In SGS-Thomson, the court noted that no party put in any evidence of a sham. Id. at
*5. Further, the assignments were purchased for value—$10,000. Id. No party presented that
court with the argument that the underlying suit was being prosecuted by a law firm in disguise.
See generally id. The absence of this argument was not because of bad lawyering, but because it
clearly was not the case. Both parties in SGS-Thomson were bona fide participants in the
electronics business. This case stands as no defense to the arguments presented herein.

The SGS-Thomson court cites Rawlings v. Nat'l Molasses Co., 394 F.2d 645, 684 (9th
Cir. 1968), which Righthaven also points to. The Rawlings court encountered joint owners of a
patent who learned of infringement. One wanted to sue, one didn't. Id. at 647-48. The owner not
wishing to engage in litigation assigned the rights to the co-owner, who proceeded with
litigation. Id. at 648. The assignment wasn't in the nature of a representation agreement, nor was
the assignee in the business of engaging in these sorts of transactions. It was a one-time
transaction made between bona fide owners clearly not done to enable the assignee to provide
legal services. Id. No one raised that issue because it wasn't an issue in the case.

Another case Righthaven claims for support is Vaupel Textilmaschinen KG v. Meccanica
Euro Italia SPA, 944 F.2d 870 (1991). But the Vaupel case is no better for Righthaven, as

Vaupel was actually using a patent as a licensee when it discovered infringement. See generally id. In that case, Vaupel's original license contemplated enforcement roughly ten years before discovering infringement. Id. The license required the patentee and Vaupel to work together on a case-by-case basis to determine whether to sue over future infringements. Id. at 875.

After an infringement was discovered, the patentee and Vaupel agreed on an assignment so Vaupel could pursue litigation, with each getting a portion of the proceeds. Id. Again, the key difference with Righthaven is this: Vaupel was not in the business of litigation. Vaupel and the patentee had a bona fide business relationship and arranged their affairs to defend against a mutual enemy. No one argued the Vaupel assignment was cover for a representation agreement.

### D. How to determine the (in)validity of an assignment.

Not every contingent-payment assignment is per se invalid in every jurisdiction. Where such an assignment is not a representation agreement in disguise, it can survive judicial scrutiny. And even a bought-and-paid-for, unqualified assignment can be struck down as a disguised representation agreement if the parties' true intent is not reflected in the assignment. For example, some courts allow unqualified assignments of contractual debts to be purchased on contingency by analogy with promissory notes. The United States Supreme Court has upheld such assignments.[8] This is by no means a universal holding—many states, including South Carolina, reject contingent-payment assignments per se, even over sum-certain debts.[9] But

---

[8] E.g., Sprint Communications Co., L.P. v. APCC Services, Inc., 554 U.S. 269, 269 (2008) (holding assignee of a claim for money owed has standing even when assignee will recoveries to assignor); E.g, People v. Adams, 243 P.3d 256, 266 (Colo. 2010) ("With a valid assignment and counsel, a licensed collection agency that is also a corporation may recover accounts payable, even when those accounts are assigned on a contingency payment basis.").

[9] Roberts v. LaConey, supra; Compton v. Atwell, 207 F.2d 139, 140-141 (D.C. Cir. 1953) ("[W]hether an assignee for collection only is the real party in interest . . . has produced a variance of judicial opinion" and "has so divided other courts").

regardless of the form of the assignment, there is no exception to the rule that an assignment cannot be cover for a representation agreement.

American courts have not articulated a single test for determining whether an assignment is a representation agreement in disguise. Most engage in a fact-specific inquiry, looking at the language of the assignment, the conduct of the parties, and the totality of the circumstances involved. The authorities provide about a dozen guideposts for courts considering these issues:[10]

1.      An assignment must be an "absolute, unconditional, and completed transfer of all right, title, and interest in the property that is the subject of the assignment . . . with the concomitant total relinquishment of any control over the property." <u>Bank of Cave Spring v. Gold Kist, Inc.</u>, 327 S.E.2d 800, 802 (Ga. Ct. App. 1985). In the text of the assignment, the assignor must "manifest an intent to transfer and must not retain any control or any power of revocation." <u>Burkhardt v. Bailey</u>, 680 N.W.2d 453, 463 (Mich. Ct. App. 2004).

Here, the right of reversion in the SAA entirely defeats the idea that this is an "assignment" of any type. "[Assignor] shall have the right at any time to terminate, in good faith, any Copyright Assignment[.]" <u>See</u> SAA § 8, Ex. A at 4. A true assignment cannot be terminated, because it isn't a temporary condition. Assignments are permanent transfers from one party to another. The clear intent of Righthaven is to simply borrow rights—just enough to sue over—then return the copyright to the assignor after (or even during) the litigation. That transaction is simply not an assignment. This factor, by itself, invalidates the assignment.

2.      Facts showing that the assignor-assignee relationship is really one of master-servant will invalidate an assignment. <u>Id.</u> Where litigation is involved, the assignee is exposed to liability for

---

[10] Defendant Eiser in no way suggests that the foregoing twelve factors constitute a twelve-factor test that is necessary for resolving the question before the Court. Complex, multi-factor tests are often met with criticism, and justifiably so. Rather, Defendant Eiser's purpose in this section is to show that under any permutation of assignment law, Righthaven's assignments are invalid.

unauthorized practice of law. E.g., Roberts v. LaConey, supra.

Righthaven cannot even come close on this factor. The SAA indicates that copyright assignors "engage" Righthaven to undertake the pursuit of copyright infringement lawsuits. See SAA § 3.4, Ex. A at 3. Statements made by officers of Righthaven's clients indicate they ultimately control the litigation, not Righthaven. See Arkansas Democrat-Gazette Story, Ex. N at 3; New York Times Story, Ex. O at 3.

3.    An assignment for the express purpose of litigation raises the specter of an impermissible representation relationship and unauthorized practice. E.g., Hospital Credit Exchange, supra. Righthaven's assignments are exclusively intended to enable litigation.

4.    Likewise, a contingent-payment assignment involving litigation raises the specter of an impermissible representation relationship and unauthorized practice, even moreso when litigation is the exclusive enterprise of the assignee. E.g., Norvell, supra; Hospital Credit Exhange, supra. With Righthaven, payment for the assignments is entirely contingent on success in litigation. SAA at § 5, Ex. A. at 3 (remitting 50% net litigation proceeds to Righthaven client).

5.    An assignee who makes a regular business out of obtaining assignments and filing lawsuits over the claims is exponentially more likely to be engaged in improper transactions than a one-time assignee engaged in the same conduct. Compare Norvell, supra with Vaupel, supra. All Righthaven does is file lawsuits. There is no other component to the Righthaven business.

6.    An assignee-for-litigation who "holds himself out as peculiarly qualified or equipped" to engage in the litigation is likely committing unauthorized practice. Norvell, supra, at 47. Righthaven calls itself "The Nation's Pre-Eminent Copyright Enforcer." See Righthaven Website, Ex. V.

7.    When an assignee litigates an assigned claim on contingency, "assignments for collection," i.e. accounts payable, promissory notes, or contractual debt, are far more likely to be upheld than assignments of causes of action that are not for a sum-certain debt. Sprint Communications, supra, at 269. (holding limited to legal claim for money owed); Adams, supra, at 262 (refusing to permit assignment of claims for statutory penalties (identical in nature to the $150,000 willful infringement penalty in the Copyright Act)). Further, some causes of action— including copyright infringement claims—are per se unassignable. E.g., Silvers at 890 ("the Copyright Act does not permit copyright holders to choose third parties to bring suits on their behalf."). Righthaven does not file suit over contractual debt; these assignments are not for collection, they are for copyright infringement claims, which are per se unassignable.

8.    An assignment for litigation incident to bona fide business operations of the assignee and assignor is likely to be upheld. E.g., SGS-Thomson, supra; Rawlings, supra; Vaupel, supra. Righthaven engages in no bona fide business operations. Righthaven's operations are entirely limited to the prosecution of lawsuits. Righthaven's assignments are in no way incidental to some genuine mutual business, Righthaven's litigation over assignments is its business.

9.    If the assignor's cooperation will be necessary or is expected in a subsequent lawsuit by assignee, the assignment is more likely to be held invalid. Adams at 264.    Here,    Righthaven's SAA requires its clients to "cooperate fully and candidly with Righthaven with respect to the Infringement Action[.]" See SAA § 9.6, Ex. A at 6. This is irrefutable evidence that the relationship is not one of assignor-assignee.

10.    Creative attempts to use a valid-in-form assignment to accomplish a forbidden purpose are ineffective. E.g., Jones v. Niagara Frontier Transp. Auth., 722 F.2d 20, 23 (2d Cir. 1983) (procedural device of an assignment cannot circumvent rules preventing a lay person from

representing a corporation); Brown v. Unauthorized Practice of Law Comm., 742 S.W.2d 34, 42 (Tex. Lt. App. 1987) (contracts to act as plaintiffs' agent on a contingency to collect personal injury claims constituted the unauthorized practice).

Even if these assignments were valid in form, they are clearly intended to allow a non-law firm to practice law and to allow a law-firm-in-disguise to have non-lawyer ownership and investment, both forbidden by public policy. Any assignment made by Righthaven in the future is nothing but a creative attempt to avoid the prohibition on assignments of the bare right to sue over copyright infringement. Righthaven's only purpose in life is to file infringement claims, and any "assignment" purporting to provide any other rights is just an attempt to sneak past the Copyright Act. That ipso facto invalidates the assignment.

11.    Considerations of public policy and prudence are also relevant. E.g., Secretary of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 955 (1984) ("In addition [Article III] limitations, there are prudential considerations that limit the challenges courts are willing to hear. The plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.") (quotation omitted).

Judge Mahan already held Righthaven offensive to public copyright policy: Righthaven's "litigation strategy has a chilling effect on potential fair uses of Righthaven-owned articles, diminishes public access to the facts contained therein and does nothing to advance the Copyright Act's purpose of promoting artistic creation." Jama Summary Judgment, Ex. H at 7.

Another important policy consideration is that many if not all of Righthaven's lawsuits involve no or de minimis actual damage and no or de minimis infringement. So far as Defendant can determine, Righthaven has yet to provide a scintilla of evidence that either it or its clients suffered *any* actual damages in any of its 275 cases. This is an astounding fact. Righthaven has

demanded about $100,000 per case,[11] meaning Righthaven has engaged the federal judiciary seeking about $50,000,000 in statutory damages *without showing one dime of actual damages*. Neither the Copyright Act the Judiciary Act were intended to enable this sort of scheme.

Even if the assignments weren't fatally flawed, Defendant submits this is exactly the sort of situation where standing should be denied on prudential grounds. Righthaven's CEO has hungrily stated his belief that there are millions if not billions of copyright infringements on the Internet[12]—and, obviously, he would dearly like to sue over each and every one. There is place in the world for copyright litigation, but Righthaven has made clear that it is institutionally incapable of distinguishing between real content pirates and unintentional infringement. In many cases, Righthaven can't even distinguish between infringement and obvious fair use.[13]

Righthaven's scheme visits real consequences on people totally disconnected from it. The federal judiciary does not have infinite resources to handle cases, and Righthaven's dime-store damages are, to put it bluntly, not worth this Court's time. The Righthaven cases have occupied this Court, all ten district judges in Nevada, at least four of the six magistrate judges in Nevada, a district judge in Colorado (handling over 50 Righthaven cases), and two Ninth Circuit panels.

---

[11] Early Righthaven cases sought $75,000 in statutory damages. Later Righthaven cases, including this one, seek full statutory damages of $150,000.

[12] Righthaven CEO Steve Gibson: "We perceive there to be millions, if not billions, of infringements out there[.]" *Wired.com* Story, Ex. P at 3.

[13] For example, Righthaven's no-warning suit against the Democratic Underground website was over four paragraphs from a 34 paragraph story posted as part of a political discussion.

How many real cases have been delayed as a result of Righthaven?[14] And how many real cases would be delayed if Gibson's wish of millions or billions of copyright lawsuits comes true? Between active, senior-status, and magistrate judges, there are about 2,000 individuals in the United States with authority to adjudicate copyright suits. Gibson's plan is to saddle each of them with between a thousand and a million de minimis lawsuits, all captioned "Righthaven v."

The federal judiciary is not a national network of small claims courts. This is not to say the courthouse doors should ordinarily be closed to plaintiffs with small actual damages in federal question cases—such a decision should be reserved for the rarest of cases. But the law does not require the bench to turn a blind eye to Righthaven's special brand of nonsense. All Americans are equal before the law, but all lawsuits aren't. Denying standing to Righthaven as a matter of prudence is well within the sound discretion of the judiciary.

12.     Courts can go behind the language of an assignment and investigate the conduct and true intentions of the parties. If this shows that the assignor retained some level of control or a power of revocation—even where the documents denied that power—the assignment is invalid. Adams, supra, at 263-65. No matter what an assignment says, if the intent of the parties is inconsistent with an absolute, unconditional, and complete transfer, the assignment fails.

Righthaven and its media clients in no way intend for Righthaven to get an absolute, unconditional, or complete transfer of anything. It is beyond dispute that Righthaven's intent is

---

[14] Even worse is that Righthaven's subterfuge regarding its assignments has caused a tremendous waste of judicial resources and the resources of Righthaven defendants. Righthaven defendants have, in the aggregate, probably spent close to a million dollars on legal fees so that their attorneys could defend on the traditional grounds of fair use, implied license, etc. Righthaven has already lost several cases on fair use. But now it turns out Righthaven never even had standing because its assignments are shams. It is no different than if a defendant spent a fortune defending a wreck case, got a defense verdict, then found out while walking out of the courtroom that the plaintiff had been lying the whole time about being in the other car. This is *exactly* what Righthaven has done.

not to be an assignee but merely to look like one to all the world—including the federal judiciary—while, in truth, the only "rights" Righthaven had were merely on loan. Righthaven's assignments aren't just run-of-the-mill shams, they are quintessential, blue-ribbon examples.

Righthaven's next tactic is to rewrite its assignments until it finds the magic words that give it standing under the Copyright Act. See Righthaven Response to Amici, Ex. M at 5 n.1. But when an assignment is the basis for standing, magic words aren't enough. Not only do the parties have to recite a permanent, unconditional transfer—they actually have to mean it. But Righthaven doesn't, and it never will.[15]

Even if Righthaven came to court tomorrow with an assignment of all right, title, and interest containing no reversionary language whatsoever, the practices of Righthaven and its clients for the past year and a half would be a millstone around Righthaven's neck that could never be removed. At this point, Righthaven cannot ever make a satisfactory showing that an assignment isn't a sham. Righthaven can't ever show[16] that it doesn't have a backroom deal with its media client to transfer the copyright back after the lawsuit is over. They've already done it. Their only mistake was that they put it in writing, and they won't make that mistake again. Frankly, not only do Righthaven and its clients lack the requisite intent to assign, they actually

---

[15] Actually, Righthaven likely doesn't care one way or another. Righthaven's media clients are almost certainly the obstacle to Righthaven obtaining genuine assignments. Righthaven's clients are newspapers who rightly value the integrity of their archives. *The Denver Post* and the *Las Vegas Review-Journal* don't want their archives compromised by permanent, piecemeal assignments to a third party for litigation that is ephemeral compared to the lifetime of a newspaper. But they can't have it both ways—either the archives are compromised, or the assignments are shams. The fundamental failure of Righthaven lies in the need of its media clients to have their cake and eat it too. The law of assignment simply does not allow that.

[16] The Defendant does not intend to raise the idea of burden shifting here. But it seems clear, at least as a practical matter, that the burden is squarely on Righthaven from this point forward to prove that future assignments aren't shams. That burden is one Righthaven can never meet.

posses a clear intent to enter into sham assignments.[17]

Out of these twelve factors every single one is is squarely against Righthaven. Several of the factors are independently fatal. It is crystal clear that the Righthaven assignments are void. Righthaven is not a bona fide assignee, it is a law firm in disguise. Its assignors aren't giving up their rights, they are retaining counsel, rendering the assignments completely invalid.

### E. State law can invalidate a copyright assignment, and South Carolina law does.

On general matters of contract law, state law provides the rule of decision in this case:

The only state "laws" applied by the court below were Georgia rules of contract construction. While the context of copyright law in which the agreement exists cannot be overlooked, application of Georgia rules to determine parties' contractual intent is not preempted by either copyright act nor does their application violate federal copyright policy. . . . Cf. Aronson v. Quick Point Pencil Co., 440 U.S. 257 [] (1979) (state law is not displaced merely because contract relates to intellectual property). It is possible to hypothesize situations where application of particular state rules of construction would so alter rights granted by the copyright statutes as to invade the scope of copyright law or violate its policies. We need not, however, set forth these extreme situations for it is clear that the application of Georgia rules of construction in the case at bar is not one of them.

Fantastic Fakes, Inc. v. Pickwick Int'l, Inc., 661 F.2d 479, 483 (5th Cir. 1981).

---

[17] Comparing the Righthaven enterprise with the other cases cited in this brief leads to an interesting conclusion: Righthaven is a rare and possibly unique example of a sham assignee who actively sought to suppress evidence of the sham assignment. Righthaven's failure to file proper financial disclosures coupled with its aggressive objection to releasing the original SAA show that Righthaven appreciated the illegality of its conduct and pressed on. In the cases cited in this brief, most if not all of the parties found to have gone over the line did so unintentionally and never made any attempt to hide what they were doing. By and large, those parties were operating in good faith and unknowingly and unintentionally ended up on the wrong side of the law. Righthaven has in no way operated in good faith, instead trying to suppress all evidence of the true nature of its transactions so that it could continue its sham modus operandi. Righthaven's uniqueness on this point is not enviable. See Democratic Underground Dismissal, Ex. D at 10 (finding Righthaven breached its duty of candor to the federal judges in Nevada, and in so doing induced them to make procedural rulings in Righthaven's favor: "As the undersigned issued one of the orders Righthaven cites [to support its standing arguments], the undersigned is well aware that Righthaven led the district judges of this district to believe that it was the true owner of the copyright in the relevant news articles. Righthaven did not disclose the true nature of the transaction[.]")

The law of assignment is a subset of contract law. Ergo state law can invalidate a copyright assignment unless the law in question violates federal copyright policy. The particular law implicated here is the invalidity of assignments that are truly representation agreements, a matter unrelated to federal copyright policy and squarely within traditional state authority. Nothing in the Copyright Act or embodied in any federal copyright policy discloses an intention to displace state law on sham assignments or unauthorized practice. In fact, Righthaven threatens federal copyright policy, as Judge Mahan noted. <u>Jama</u> Summary Judgment, Ex. H at 7.

Under South Carolina law, the Righthaven assignments are void for at least two distinct reasons and completely unsalvageable for a third. The first reason Righthaven's assignments are void is that the assignments are given to enable the assignee to engage in litigation and are purchased on a contingency. Such an assignment is void against South Carolina public policy under <u>Roberts v. LaConey</u>, 650 S.E.2d 474 (S.C. 2007).

The second reason is that Righthaven's "assignments" are simply not assignments under South Carolina law. In South Carolina, "Three elements constitute an assignment: (1) an assignor; (2) an assignee; and (3) transfer of control of the thing assigned from the assignor to the assignee." <u>Moore v. Weinberg</u>, 644 S.E.2d 740, 745 (S.C. Ct. App. 2007). With Righthaven, there is no transfer of control of the thing assigned. Righthaven gets no control over any of the 17 U.S.C. § 106 exclusive rights, nor does Righthaven even get control over the only thing it truly wants, the right to sue, because at all times that right is subject to veto by its clients.

The immediate consequence is that Righthaven's Amended Complaint must be dismissed for lack of standing. But this outcome is not temporal, and the dismissal should be with prejudice. Despite its stated intent to fight on the beaches, on the landing grounds, in the fields,

in the streets, in the hills, and never surrender,[18] Righthaven simply cannot fix what is wrong.

Righthaven's raison d'être is to prosecute lawsuits on contingency for its clients. But in South Carolina, there is exactly one way such an arrangement is legal: when it is between a lawyer or law firm and a client. Roberts v. LaConey isn't just about voiding assignments of a certain form; the holding goes much further than that. Roberts v. LaConey stands for a broad proposition: any arrangement that involves an agent prosecuting lawsuits for a client, regardless of its form, is invalid unless the agent is authorized to practice law. No amount of transactional trickery can avoid the reach of the rule, and that fact is lethal to Righthaven in South Carolina.

### F.  Why?

The Court may wonder—as have many Righthaven observers—why Righthaven could not simply operate as a law firm. After all, Righthaven's cases are not filed pro se, so why take the risk of the whole scheme being declared illegal? The answer is as simple as it is green: money. Righthaven is a for-profit business that needed investors to float venture capital to get it started. No American jurisdiction authorizes this arrangement with law firms—non-lawyers cannot invest in law firms, nor can lawyers split fees with non-lawyers. E.g., Rule 5.4(a), SCRPC ("A lawyer or law firm shall not share legal fees with a nonlawyer[.]").

While these rules are sometimes criticized with free market arguments, Righthaven demonstrates the wisdom of those restrictions. Righthaven is a lawsuit mill, and the demands of its investors have clearly created an environment where its attorneys have dispatched with the quaint notions of properly investigating lawsuits prior to filing, avoiding misrepresentations to courts, etc. Righthaven calls itself an "enforcer." And that is certainly what Righthaven is, in the

---

[18] Cf. Sir Winston Churchill, Remarks to the House of Commons of the Parliament of the United Kingdom, (June 4, 1940) at 11:27, available at audio.theguardian.tv/sys-audio/Guardian/audio/2007/04/20/Churchill.mp3.

most pejorative sense of the term. Righthaven's complaints are not requests for courts to remediate injustice, they are clubs used to extract settlement dollars from Righthaven targets.

Consider a world where Righthaven's scheme is legitimate. Every law school in the country should close its doors and every state bar should wind up its affairs. Any nonlawyer can strike a deal with anyone holding an actionable claim: "Has someone injured you? Damaged your property? Call the Abe Jackson Assignment Firm at 1-800-GET-CASH! Assign Abe your claims. We handle the lawsuit, and we give you two-thirds of the recovery. Over 20 years practicing assignment in state and federal court. We don't get paid unless you get paid!" It is not an exaggeration to say that this imaginary ad is *precisely* what Righthaven does.

Righthaven has filed 275 lawsuits and promises to file many more, holding itself out as "The Nation's Pre-Eminent Copyright Enforcer." Copyright is a legal right, and a business whose sole occupation is the enforcement of legal rights in court is necessarily either a law firm or a business is engaged in the unauthorized practice of law. Righthaven is the latter.

## IV. THE BURDEN SHIFTS TO RIGHTHAVEN

Righthaven's assertion of standing boils down to two factual claims: (1) prior to filing this action on December 2, 2010, MediaNews Group, Inc. validly assigned Righthaven full ownership in the copyright to the Rosen Letter, i.e. the "Work"; and (2) MediaNews Group had the ownership rights to assign as author of the Rosen Letter. Eiser submits that both are untrue and demands Righthaven submit sufficient evidence to meet its burden of proving jurisdictional facts under Adams v. Bain, supra. Defendant makes the following contrary allegations:

### A.  *MediaNews Group did not validly assign any rights to Righthaven.*

1.    Righthaven is a company whose sole line of work is the filing of copyright infringement actions over material created by others. Righthaven is not a law firm. See Righthaven's

complaints; SAA, Ex. A; SAA Clarification, Ex. B; and various Nevada rulings.

2.    The sole intent is for Righthaven to file these actions for its clients but in its own name. Righthaven's clients engage it under contracts known as "strategic alliance agreements." <u>Id.</u>

3.    Righthaven's SAAs are the same in substance for each of its clients. <u>Id.</u>

4.    Righthaven's clients truly control Righthaven litigation. <u>See</u> SAA, Ex. A; the SAA Clarification, Ex. B; <u>Hoehn</u> Dismissal, Ex. E at 8; the <u>Democratic Underground</u> Dismissal, Ex. D at 5; *Arkansas Democrat-Gazette* Story, Ex. N at 3; *New York Times* Story, Ex. O at 3.

5.    The assignment by which Righthaven claims ownership of the copyright in the Rosen Letter is ineffective under the Copyright Act because it attempts to assign the bare right to sue.

6.    The assignment is void because it violates South Carolina public policy as expressed in <u>Roberts v. LaConey</u>, 650 S.E.2d 474 (S.C. 2007) and because it is not an assignment under South Carolina law in that no control is assigned from client to Righthaven. <u>Moore v. Weinberg</u>, <u>supra</u>.

7.    None of these problems can be addressed by redrafting the assignment. Any attempt at doing so would be a sham designed to hide the true intent behind the Righthaven scheme.

### *B.  MediaNews Group is not the author of the Rosen Letter.*

8.    Mike Rosen wrote the Rosen Letter.

9.    Rosen has never been an employee of MediaNews Group, but instead a "freelance columnist." <u>See</u> Rosen Freelance Column, Ex. Q at 2.

10.    A "freelance columnist" is an independent contractor, not an employee. <u>See</u> <u>Community for Creative Non-Violence v. Reid</u>, 490 U.S. 730 (1989). And for the work of an independent contractor to be a work for hire, it must be "a work specially ordered or commissioned for use as a contribution to a collective work . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101(2).

11.    The Rosen Letter was produced for use as a contribution to a collective work.

12.    But the Rosen Letter was not "specially ordered or commissioned." In <u>Playboy Enterprises, Inc. v. Dumas</u>, 53 F.3d 549 (2d Cir. 1995), the Second Circuit concluded the test as to whether a work is "specially ordered or commissioned" is whether the motivating factor was the person requesting preparation of the work who induced its creation.  <u>Id.</u> at 562.

13.    Rosen has been a newspaper columnist for approximately 30 years. <u>See</u> *Denver Westword* Story about Rosen Plagiarism, Ex. R at 2.

14.    Rosen has only written columns for *The Denver Post* for just over two years.

15.    Prior to that, Rosen was a freelance weekly columnist for the *Rocky Mountain News*, a Denver-area newspaper that shut down on February 27, 2009. <u>See generally</u> *Rocky Mountain News* Shutdown, Ex. S; Rosen *Rocky Mountain News* Column, Ex. T.

16.    Rosen has published columns elsewhere, including but not limited to *Real Clear Politics*. <u>See generally</u> Rosen *Real Clear Politics* Column, Ex. U.

17.    Rosen's purpose in publishing columns is to disseminate his political views and publicize his primary occupation as host of a political talk radio show on 850 KOA in Denver, which is advertised on all or nearly all of his columns, including every column cited herein and the Rosen Letter at issue in this case. <u>Compare</u> Complaint Exhibit 1, Dkt. 1-1 at 3 ("Mike Rosen's radio show airs weekdays from 9 a.m. to noon on 850-KOA.") <u>with</u> Rosen Freelance Column, Ex. Q. at 2 ("Freelance columnist Mike Rosen's radio show airs weekdays from 9 a.m. to noon on 850-KOA.") <u>and</u> Rosen *Rocky Mountain News* Column, Ex. T at 1 ("Mike Rosen's radio show airs weekdays from 9 a.m. to noon on 850 KOA.") <u>and</u> Rosen *Real Clear Politics* Column, Ex. U at 2 ("Mike Rosen's radio show airs daily from 9 a.m. to noon on 850 KOA.").

18.    *The Denver Post* is not the impetus behind Rosen writing columns. Rosen has regularly

written columns for 30 years—only the last two years for *The Denver Post*. If *The Denver Post* terminated Rosen's column, he would continue to regularly produce it elsewhere.

19.     MediaNews Group is not the motivating factor behind Mike Rosen writing newspaper columns. Rosen's columns are not "specially ordered or commissioned," are not works for hire, and MediaNews Group is not the author for the purposes of copyright law—Mike Rosen is.

20.     Righthaven claims to derive title to the Rosen Letter by assignment from the author of the Rosen Letter as a work for hire, MediaNews Group. But the Rosen Letter is not a work for hire, therefore Righthaven's claims about its derivation of title are inaccurate.

### V. CONCLUSION

Given Righthaven's publicly expressed plans to subject its targets to endless litigation over injuries it did not suffer for claims it does not own, Defendant Eiser respectfully submits that a decision on the various grounds asserted in this brief would not only be a perfectly legitimate basis for deciding the standing issues in this case, it would provide a sorely-needed permanent resolution to Righthaven's copyright claims against Eiser.[19]

---

[19] Righthaven's conduct strongly suggests it intends to pursue an action at some point in the future against the Lowcountry 9/12 Project, the nonprofit, eleemosynary corporation on whose blog the Rosen Letter was posted. Accordingly, the Lowcountry 9/12 Project has filed a Petition for Original Jurisdiction in the South Carolina Supreme Court to enjoin Righthaven from taking any action against it or pursuing any future actions in South Carolina. Undersigned counsel represent the Petitioners in that action and a copy of the initial filing is attached as Exhibit W to this motion. The Lowcountry 9/12 Project is joined in that action by Citizens Against Litigation Abuse, Inc., a South Carolina nonprofit corporation that focuses on opposing abusive litigation in areas relating to political speech and strategic lawsuits against public participation, known as SLAPP lawsuits. This original jurisdiction petition was filed due to the distinct possibility that Righthaven's copyright action against Eiser may be ended in a way that does not collaterally estop Righthaven from pursuing the Lowcountry 9/12 Project, and since the Lowcountry 9/12 Project is not a party to this action, Righthaven may very well be able to pursue it in the future absent an advisory ruling from the South Carolina Supreme Court. Defense counsel in no way seek to needlessly multiply litigation—instead, Righthaven's stated intent to rewrite, reassign, and refile ad infinitum necessitated a preemptively defensive strategy.

American courts generally seek to make decisions on the narrowest grounds possible, for a variety of reasons. That tendency is at its height in federal court, where advisory rulings are constitutionally prohibited. But Defendant Eiser submits that nothing herein seeks an advisory ruling. All issues raised on this motion go to standing. A ruling on this basis will give clarity and finality to both parties. Given Righthaven's expressed intention to keep tinkering with its assignments until it finds magic words that keep it in court, this sort of ruling would save inordinate amounts of judicial resources and the resources of the parties. Additionally, such a ruling would give Righthaven the guidance it claims to seek as to how copyright cases can be pursued by third-party copyright enforcers. Such a practice is perfectly legitimate when such claims are brought by bona fide law firms representing bona fide clients.

Unless directed otherwise by the Court, Defendant Eiser intends to submit a proposed order with, or possibly in lieu of, a reply to any response filed by Righthaven. Pursuant to 17 U.S.C. § 505, Defendant Eiser further respectfully petitions the Court for an award of all costs and reasonable attorneys' fees in the event Righthaven's Amended Complaint is dismissed or Eiser otherwise prevails on Righthaven's copyright infringement claim.

Undersigned counsel certifies compliance with Local Civil Rule 7.02. Consultation is not required on motions to dismiss. Undersigned counsel again apologize to the Court for the extremely comprehensive nature of this motion to dismiss. Defendant Eiser made a prior motion to dismiss (Dkt. #37) based on failure to state a claim that was just over two pages long and could not have been more concise.[20] But given Righthaven's current litigation tactics nationwide,

---

[20] Defendant has no objection to withdrawing its prior motion to dismiss (Dkt. #37) and substituting this one for adjudication. A dismissal for failure to state a claim based would be without prejudice and would only prolong this litigation, as Righthaven would immediately file a new complaint attempting to address the deficiencies that led to the first dismissal.

it is abundantly clear to undersigned counsel that anything less than a comprehensive order dismissing the copyright action with prejudice will not end this litigation.

Defendant Dana Eiser respectfully requests this Honorable Court dismiss Plaintiff's Amended Complaint against her for lack of subject matter jurisdiction as described herein. Defendant Eiser also respectfully requests an order allowing her to recover costs and a reasonable attorney's fee against Plaintiff pursuant to 17 U.S.C. § 505.

Respectfully submitted,

s/J. Todd Kincannon

J. TODD KINCANNON, ID #10057
THE KINCANNON FIRM
1329 Richland Street
Columbia, South Carolina 29201
Office: 877.992.6878
Fax:    888.704.2010
Email: Todd@TheKincannonFirm.com

s/Bill Connor

BILL CONNOR, ID #9783
HORGER AND CONNOR LLC
160 Centre Street
Orangeburg, South Carolina 29115
Office: 803.531.1700
Fax:    803.531.0160
Email: bconnor@horgerlaw.com

s/Thad T. Viers

THAD T. VIERS, ID #10509
COASTAL LAW LLC
1104 Oak Street
Myrtle Beach, South Carolina 29578
Office: 843.488.5000
Fax:    843.488.3701
Email: tviers@coastal-law.com

July 7, 2011                                    Attorneys for Defendant